IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2020

## IN RE JAXON W.H.

**Appeal from the Chancery Court for Hamblen County**
**No. 2018CV538      Douglas T. Jenkins, Chancellor**

_____

### No. E2019-01836-COA-R3-PT

_____

A father appeals the trial court's decision terminating his parental rights on the grounds of abandonment by failure to support and failure to visit.  Finding clear and convincing evidence to support both grounds and that termination of the father's parental rights is in the child's best interest, we affirm the trial court's decision.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and CARMA DENNIS MCGEE, J., joined.

Betsy Gay Stibler, Talbott, Tennessee, for the appellant, Brandon J.H.

Rachel Warren Ratliff, Johnson City, Tennessee, for the appellees, Ashley C.H. and Ryan A.H.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Brandon J.H. ("Father") and Ashley C.H. ("Mother") are the biological parents of Jaxon W.H., born in 2014.  Mother married Ryan A.H. ("Stepfather") in November 2018.[1] Mother and Stepfather filed a petition to terminate Father's parental rights and for adoption on December 7, 2018.   The grounds for termination alleged in the petition were abandonment by failure to support and abandonment by failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1), failure to manifest an ability and willingness to assume legal

_____

[1] Prior to Mother and Stepfather's marriage, they filed a petition for the termination of parental rights and adoption against Father.  The trial court dismissed the petition on the ground that Mother and Stepfather lacked standing to seek the termination of Father's parental rights because they were unmarried at the time the petition was filed.

and physical custody or financial responsibility pursuant to Tenn. Code Ann. § 36-1-113(g)(14), failure to make reasonable and consistent payments for support in accordance with the child support guidelines pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii), and failure to seek reasonable visitation pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii).

The case went to trial on August 5, 2019. Mother testified that she and Father were together when Jaxon was born in the spring of 2014 and that Father signed the birth certificate. According to Mother, she and Father were "on and off" from the time of Jaxon's birth until October 2016. She described their relationship as "very toxic" and stated that they "argued a lot." Mother testified that their fighting was "physical and emotional." Mother stated that she never called the police on Father, but "the police did come out one time in 2016 to make sure he left . . . my house after an altercation."

Mother acknowledged that Father had a bond with Jaxon for his first two years, but "that was it." She further testified that, when she and Father were together, he helped take care of the child and worked to pay household expenses. When they separated, Father would "get [Jaxon] on Saturday mornings and I would pick him back up on Sunday mornings." At some point, "it started being toxic, and then I had my mom arrange visits." Father would go to Mother's ("the grandmother's") house to pick Jaxon up.

When asked about when things became toxic, Mother recalled that, in May 2016, she did call the police and filed a harassment report concerning Father because he was appearing at her work and calling her repeatedly. Mother did not follow through with the harassment report, however, so Father was not convicted of harassment. There was an incident in early June 2016 when Father came to grandmother's home to pick Jaxon up; Father entered the house and started arguing with Mother. The grandmother asked Father to leave. That was the last time he had a planned visit with Jaxon.

Mother stated that she and Jaxon last saw Father at a Christmas parade in Morristown in December 2016. Father approached them and started calling Jaxon's name. Mother cautioned Father that "it wasn't the time and the place because we were in a crowd of people." According to Mother, Father had a history of causing arguments.

Mother testified that Father did not contact her to request visitation with Jaxon and did not visit with Jaxon during the year prior to the filing of the termination petition in December 2018. During that year-long period, Mother received one payment of $40.00 from Father in December 2018, immediately prior to the filing of the present petition. Mother explained that she received the payment after she and Stepfather voluntarily dismissed another petition to terminate filed against Father but before the filing of the present petition. Mother testified that, since October 2016, Father had not otherwise contacted her or visited Jaxon and that she had not received any other money from him.

Mother stated that she started dating Stepfather in October 2016. Although Stepfather had been around Jaxon a few times before that, the two did not officially meet until October 2016. Mother and Jaxon would stay at Stepfather's home, and Stepfather started taking care of Jaxon. During the first year of their relationship, there were times when Stepfather would care for Jaxon or pick him up at his grandmother's house while Mother was at work. Mother agreed that Stepfather had "basically play[ed] the father figure for Jaxon" for the past three years.

On cross-examination, Mother acknowledged that, when she and Father were together, he contributed more money to the household than she did. When he was working in Texas, Father sent money home to Mother. Mother alleged that Father stopped paying her any child support when he learned that she was in a relationship with another man. Mother stated that she and Father argued about her infidelity as well as about his infidelity.

Father was the only other witness at the hearing. He testified that, around the time of Jaxon's birth, he felt that he "had nothing to worry about as far as a family, a future family with [Mother] and my child." He thought that he and Jaxon developed a "great relationship." Father stated that he was an equal caregiver with Mother and that he provided most of the household income. Father estimated that he earned $30,000 to $35,000 the first year of Jaxon's life. During Jaxon's second year, when Father started doing millwright work, he earned $65,000.

During the second year after Jaxon's birth, Father testified, "there was issues" in the couple's relationship. According to Father, they split up because "there was instances where she went out with someone behind my back." When Father found out, there were problems, but he "wanted to work it out," and Mother said that she did, too. Father stated that Mother was then unfaithful again. At that time, he was living with her in a trailer. Father described the situation as follows:

> That's when the police was called, because, of course, I was wanted gone then once I found out. So she told me she'll—I'll never see him again, if I keep trying to come around, she'll make things hard on my two older children, and so I stayed away. I didn't want the trouble. I didn't want the drama. I shouldn't have stayed away, I should have just dealt with the drama, but I didn't want that in front of the children. So it's escalated to this.

Father stated that it was his belief at that time that tensions between him and Mother would ease and they would be able to co-parent. Father has two older daughters who were fifteen and thirteen at the time of the hearing; they lived in Greenville, and he was able to see them as often as he liked. Their mother had never denied him visitation. He is also the parent of an eleven-month-old.

Father testified that "there were several times during arguments" that Mother threatened that Father would never see Jaxon again. He felt that if he went to her home she would call the police. He further testified:

I was not allowed to contact her because she did not want me to contact her. It was -- she changed her number, blocked me on social media, she moved -- I didn't know where she moved to once she moved out of the trailer.

Father stated that he first became aware of an address for Mother when she filed the first termination petition.

As to his relationship with the maternal grandmother, Father testified that "[a]t times it was good, and at times it wasn't." Most of the time, he felt that the grandmother understood he "was trying to be a good father." He did not recall any visits set up through the grandmother when he and Mother were no longer together. From Father's point of view, he was working in Texas sending money home to Mother and thinking that they were still a family. He came back to Tennessee and soon thereafter moved into the trailer with Mother and started working for her stepfather. This arrangement "lasted a very short period of time" because Father learned that Mother was being unfaithful to him. He then decided to stop working for her stepfather.

Father introduced into evidence a tax return showing that he earned $4,785.00 in 2018. To explain why he had not sent child support to Mother before he received her first termination petition, Father stated that he had "been through the [child support] system before with my two older children" and was told that "any money you send is not going to be accounted for." In other words, Father understood that, for payments to be properly credited, there had to be a child support order in place. As to his two older children, Father stated that the original court order required him to pay $65.00 per month, but he was currently paying $75.00 because he was trying to get caught up on payments.

On the subject of visitation with Jaxon, Father again stated that, prior to October 2016, he did not "recall us ever really setting up any visitation." To him, "it was just she needed someone to watch him because her and her mother couldn't, and I was just grateful to be able to keep him because we wasn't living together at that time." Father understood that he and Mother were still going to try to work things out.

Father recalled wanting to see Jaxon at the Christmas parade in 2016 and being told by Mother's friends that it was not the right time. Father stepped away and "just watched my son, observed him having a good time, and then I walked on and about my way." According to Father, all of the supposed visitation was before he and Mother finally broke up and she began another relationship. Once they were not together, he testified, Mother no longer provided him with any visitation.

Father testified that he did not talk to the maternal grandmother about seeing Jaxon. He recalled an instance after he and Mother had ended their relationship when he went to the grandmother's house. Father pulled in the driveway and asked the grandfather if Jaxon was there. After learning that Jaxon was not there, Father was getting into his car when Mother pulled into the driveway and got out of her car. According to Father, Mother was "erratic, screaming, and then [Jaxon] came out of the house." Father thought that "it would just be a dramatic scene every time I tried to come around," and they had denied him the ability to see Jaxon. Father stated that he only went to Mother's work when she asked him to do so, and that was before their relationship ended.

On cross-examination, Father acknowledged that, when he worked in Texas, he had deposited money in an account for Mother. When asked why he did not send money to that account for child support, Father responded that Mother told him that he was not going to be able to see Jaxon and he thought Mother would not acknowledge receiving money from him. Father testified that the last time Mother told him he would never see Jaxon again was in 2016. As to the reason he did not hire a lawyer to help obtain visitation rights, Father stated:

> Because I felt that maybe she would be a mother and a parent and say that he needs his father in his life that's always been there and been supportive of him. And he loved me. We were great. And I thought she would open her eyes and say well, he does need to be there and not make it such an issue. I was trying to go about it without having to do all this, but I see that it's not the road I should have taken.

Father further testified that he was told at the child support office that there was a fee associated with filing a petition and that, at the time, he did not have the money. He could not remember the precise amount he was told he would have to pay.

Father testified that he did not have any disabilities. To explain his low income of $4,785.00 in 2018, Father stated: "Because sometimes people go through a hardship in their life, and during that one year, that's what I was in a hardship in my life"

Father acknowledged that he had recently been arrested for failure to appear for child support re-evaluation with regard to a child other than Jaxon. Seven or eight months earlier, he had been arrested for attempted assault and was on probation at the time of the hearing.

Father gave the following testimony regarding his reasons for failing to contact Mother about visits with Jaxon:

Q. All right. Now, in 2016, you said that you believed things would settle down and you'd be able to co-parent [Jaxon] --

A. Mm hmm [affirmative].

Q -- with [Mother]. But then you also said that you didn't want to approach the co-parenting a year later because you wanted to be reintroduced to [Jaxon] at that time because he didn't know who you were in 2017? That's why you failed to contact [Mother]?

A. Yes, because I was -- had been denied several times over and over again an opportunity to do that.

Q. Okay. So when were you denied an opportunity -- in 2016, when did you reach out after that Christmas parade -- or, I mean – I'm sorry -- after June of 2016? Between June of 2016 and the Christmas parade, how many times did you reach out?

A. I don't recall trying to reach out then because from the time -- the first year after not being able to be allowed to be there in his life, I was denied that right so many times, and it had escalated and snowballed to a point to where I was afraid to try to go be around him because -- for the fact of simply being denied the right to try to be his father.

Q. So you were afraid you were going to be denied, so you didn't attempt to try?

A. No, I was afraid of the outcome of his reaction to the child because he was denied the right to see me, and not knowing who I was, in his mind was led to believe that there's someone else that's his father. I was afraid for him.

Q. You were afraid for him not knowing you, so that's why you didn't try to know him?

A. Yeah, because of how I was manipulated to stay away.

Q. Okay. So that -- you continued being afraid in 2017? All of 2017 you didn't want to --

A. No, it didn't stay as far as being afraid, I just didn't want the altercation. I didn't -- I don't know what answer you want me to – you're looking for. I've answered it several times.

Q. Okay, I just wanted to try to understand exactly why you didn't try, it was because you were afraid of the denial. You didn't try.

A. In 2017?

Q. Correct. To visit.

A. No, I did not try.

Q. And in 2018 --

A. I didn't know where she lived and I didn't know her number.

Q. Okay. And you didn't reach out to the grandmother to try that way? [Jaxon's] grandmother? You knew where she lived, but you didn't try --

A. No.

Q. -- with her either?

A. Because she had the same -- she felt the same as [Mother] did about me.

Q. So you didn't want a denial from the grandmother either?

A. No.

Regarding his failure to send money to Mother for child support, Father testified that he "didn't feel like it would help me any" and that "[i]t wouldn't be accredited." From Father's viewpoint, "If anyone wanted me to be able to give child support, they would have given me a phone number, a proper address . . . ." It was his understanding that Mother did not want him to be Jaxon's father.

On redirect examination, Father acknowledged that he had no way of confirming whether the account into which he had previously deposited money for Mother was still an active account. He admitted to testifying in his interrogatory responses that he was quoted a cost of $150 to file a petition for child support and that he could not afford that expense at the time. Father testified about his current monthly expenses, including $45 for probation fees, $75 in child support for his other children, $200 in rent, as well as gas and food. According to Father, during the period of August to December 2018, his earnings were consumed by his monthly obligations.

After hearing all of the evidence, the trial court made findings of fact and conclusions of law. With respect to Father's failure to visit, the trial court found that Father did not meet his burden of proof by a preponderance of the evidence to establish that his failure to visit was not willful. The court also determined that Father failed to prove by a preponderance of the evidence that his failure to support was not willful. The court found by clear and convincing evidence that, with respect to the grounds of abandonment by failure to support and failure to visit, the allegations of the petition had been proven. Finally, the court concluded that the termination of Father's parental rights was in Jaxon's best interest.

On appeal, Father asserts that the trial court erred in finding that Father willfully failed to support Jaxon during the relevant time period, that Father abandoned Jaxon by willfully failing to visit him during the relevant time period, and that termination of Father's parental rights is in Jaxon's best interest.[2]

---

[2] Pursuant to *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), we "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." We do not, however, interpret *Carrington* to mean that we "must also review grounds that the trial court found were *not* sufficiently proven when the party who sought termination does not challenge that ruling on appeal." *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *5 (Tenn. Ct. App. 2018); *see also In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 & n.5 (Tenn. Ct. App. July 23, 2018). The trial court in this case did not terminate Father's parental rights pursuant to the other three grounds included in the petition—namely, failure to manifest an ability and willingness to assume custody and two putative father grounds— and we will not address those grounds in this opinion.

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in TENN. R. APP. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521-22 (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in

certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a parent's rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004)). "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005), and *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

ANALYSIS

One ground for terminating a parent's rights is abandonment, as that term is defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Mother and

Stepfather alleged that Father abandoned Jaxon by failing to visit or support him within the four months preceding December 7, 2018, the date they filed their termination petition. "Abandonment" is defined as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i).

## I. Failure to visit.

Father asserts that the trial court erred in finding that he abandoned Jaxon by failing to visit during the relevant time period. Tennessee Code Annotated section 36-1-102(1)(E) defines the phrase "failed to visit" as follows:

> [T]he failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period.

The statute defines the phrase "token visitation" as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

Although a petitioner is no longer required to prove the respondent in a termination proceeding acted "willfully" in failing to visit or support his or her child,[3] the respondent may assert as an affirmative defense that his or her failure to visit or support was not "willful":

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of

---

[3] Prior to July 1, 2018, Tenn. Code Ann. § 36-1-102(1)(A)(i) required "that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child."

- 10 -

proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I). Because willfulness is an affirmative defense, the burden of proof is on Father to establish that his failure to visit was not willful. *See In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019); *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *13 (Tenn. Ct. App. July 15, 2019).

Willful conduct requires "acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863. We have previously stated that "willfulness" does not "require malevolence or ill will." *Id.* When conduct is "willful," "it is the product of free will rather than coercion." *Id.* A person who acts "willfully" "is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 864. The following statements apply these principles to the context of visitation and support:

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*Id.* (citations and footnote omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

Mother and Stepfather filed their termination petition on December 7, 2018. Thus, the relevant four-month period is August 7, 2018, through December 6, 2018. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that statutory four-month period covers four months preceding day termination petition was filed and does not include day petition was filed). At the time of the hearing, Father had not visited Jaxon during the relevant time period. In fact, he had not visited Jaxon since June 2016. Father maintains that his failure to visit was not willful. Whether Father failed to visit Jaxon is a question of fact. *See In re Adoption of Angela E.*, 402 S.W.3d at 640. Whether his failure to visit constitutes willful abandonment is a question of law that we review de novo, according the trial court's determination no presumption of correctness. *See In re Kolton C.*, 2019 WL 6341042, at *5.

Father emphasizes in his brief that, in 2016, Mother "moved, changed phone numbers, blocked him on social media, threatened that he would never see his son again and filed a harassment report in response to Father seeking to see his son." He described an incident when Mother let the air out of his tires. In Father's view, his attempts to see Jaxon resulted in dramatic scenes that he felt were detrimental to the child, and "he behaved responsibly by not escalating a situation he had no ability to rectify." Father "hoped that with some space and time Mother would see that the child (who was less than 2) would need and benefit from a relationship with his Father." Unfortunately, Father allowed these conditions to continue for several years, and Jaxon no longer knows Father. We agree with the trial court's finding that Father failed to prove by a preponderance of the evidence that his failure to visit Jaxon was not willful. Father made no attempt to establish visitation with Jaxon for over two years despite knowing how to contact the maternal grandmother.

Clear and convincing evidence supports the trial court's decision to terminate Father's parental rights on the ground of abandonment by failure to visit.

II. Failure to support.

Father also argues that the trial court erred in finding that he willfully failed to support Jaxon during the relevant time period. As discussed above, the burden is on Father to prove by a preponderance of the evidence that his failure to support Jaxon was not willful. Father asserts that he did not have the ability to pay "due to his income and obligations."

The trial court made the following pertinent findings:

With respect to supporting your child, you also did not pay support, although you did get one $40.00 payment in right there, excuse me, right around the time the Petition that we're hearing today was actually filed. You were always a productive person when in the early parts of your relationship with Ms. Hurley, had some pretty good jobs, and then for some reason in '18, you just made $4800.00 and some odd dollars that you paid tax on. You found, according to the proof I heard, you met all your other obligations and just sent $40.00. I mean, you could've sent $5.00 a week consistently, $20.00 a week consistently, but you had abandoned your relationship and I don't think in your mind you felt compelled to pay any money because there wasn't anything there in your mind to pay for. The law doesn't really agree with that position. The law's different than that. In the Court's opinion, and I do think that you willfully failed to support this child. The $40.00 that you did pay is no more than a token amount. I find that you had the ability to pay much more and then simply didn't. I don't find that the fact that there's not a Court Order for you to pay support to be an excuse for that. I think that's in keeping

with the applicable law. So, by clear and convincing evidence, I find that you willfully failed to support this child during the relevant period of time.

The court seems to make an implicit finding that Father was underemployed. Whether a parent's underemployment is willful depends upon whether the underemployment is voluntary or involuntary. *See In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *10 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re M.P.J.,* No. E2008-00174-COA-R3-PT, 2008 WL 3982912, at *10 (Tenn. Ct. App. Aug. 27, 2008)). A court's determination as to "whether a parent is voluntarily unemployed or underemployed is entitled to a presumption of correctness unless the evidence preponderates against that finding." *In re Selena L.*, No. E2015-02059-COA-R3-PT, 2016 WL 4056185, at *11 (Tenn. Ct. App. July 27, 2016); *see also Miller v. Welch,* 340 S.W.3d 708, 712-13 (Tenn. Ct. App. 2010).

Father presented no evidence to explain the drastic change in his taxable income in 2018 as compared to when he and Mother were together. He testified that he experienced a period of hardship, but he did not offer any further explanation. The evidence does not preponderate against the trial court's determination that Father did not meet his burden of proving that his failure to support Jaxon was not willful.

III. Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Father's parental rights, we must next consider whether the trial court properly determined that termination of Father's parental rights is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent, and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d at 682 .

In analyzing the statutory factors, the trial court found that the first two factors were not applicable "because I don't think at any time was it not safe for that child to be with you. You seem actually to be a fit parent if you had made some effort." The trial court's reasoning does not lead to the conclusion that the factors were not applicable; rather, the factors did not favor one parent over the other because both parents were able to provide Jaxon with appropriate care. The court then went on to evaluate the remaining factors:

- 14 -

[The] Court believes that number 3 [regular visitation or contact] weighs in favor of termination. Number 4, "whether a meaningful relationship has otherwise been established between the parent or guardian and the child." I think early on in the child's life there was a relationship, pretty good from what I understand, but sometime in the year 2016 that relationship was abandoned and at this point in time is nonexistent, so, that, I think, weighs in favor of termination. "The effect a change of caretakers and physical environment is likely to have on the child's emotional, physical, and medical conditions." The Court didn't hear any proof on that. Number 6, "whether the parent or guardian or other person residing with the parent or guardian has shown brutality, physical, sexual, emotional, or physical abuse or neglect toward the child or another person in the household." I did hear some vague but unrebutted proof about [Father] physically and emotionally abusing [Mother] during their relationship, but and even though that exists, the Court doesn't place real strong emphasis on that because we never had any court proceedings, we never had any law called, we just have some vague allegations that I don't think standing alone would carry the day one way or the other. Number 7, "whether the physical environment of the parents or guardian's home is healthy, safe, and whether there's criminal activity in the home, etc. etc." The physical environment of the [Stepfather's] and [Mother's] home sounds good to the Court. Didn't hear that much about [Father] other than he may have recently been charged with an assault that I don't know that much about, so that one probably weighs slightly in favor of termination, but again like I said with 6, standing alone I don't think it would be enough to carry the case one way or the other. Number 8, "whether the parent or guardian's mental and/or emotional status would be detrimental to the child." Court really heard no proof on that. Number 9, "whether the parent or guardian has paid child support consistent with the child support guidelines." Again, that weighs in favor of termination. I believe the Court has the discretion of mentioning one other factor that [the] Court believes is kind of overriding in this case, and that's stability. [Mother's] always had the child. [Mother] has always provided a home, 3 meals a day, medical care, anything this child needed, mom since day one has provided it. So, I think the stability factor with [Mother] weighs in favor of termination, as well. All the Court's findings are with under the standard of clear and convincing evidence for the record, and it follows that the Petition should be sustained.

Father argues that the trial court improperly weighed the best interest factors from the viewpoint of the adults rather than the child and that Jaxon deserves a second chance to develop a relationship with Father. We disagree. The trial court considered all of the relevant statutory factors, including the factor that Father had not maintained a relationship with Jaxon and had not seen him for over three years at the time of trial.

- 15 -

We conclude that clear and convincing evidence supports the trial court's determination that termination of Father's parental rights is in the best interest of the child.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Brandon J.H., for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE